We will proceed with oral argument in the bank rehearing of a case with which I am well familiar, Penholster v. Ayers. Counsel ready? I believe the State is the appellant. Mr. Bilderbach? Yes, Your Honor.  Thank you, Your Honor. May it please the Court. Supervising Deputy Attorney General Bill Bilderbach on behalf of the Warden of San Quentin State Prison. Scott Lynn Penholster was bound and determined to testify in the guilt phase of his trial. He said so himself and unambiguously to the trial court during the period of time when he was representing himself. Everything he has filed in every court, including his motion to expand the certificate of appealability in this court, are all directed toward continuing to press his now discredited alibi defense. Nothing anyone has said, nothing the California Supreme Court said, nothing that the panel below in this court said has deterred Mr. Penholster from continuing to attempt to press his alibi defense. Given the presence of his testimony in support of his alibi defense, any of the purported errors of counsel in the preparation and presentation of the case in mitigation have to be found to have been harmless. When he was representing himself, there was a hearing during which he was attempting to have the case dismissed for lack of speedy trial. In that hearing, Mr. Penholster said under oath, and I quote, an alibi is the only defense I will have. Given the other evidence adduced at the guilt phase of his trial, his testimony was indispensable to that alibi defense. Nothing any of the other defense witnesses said was in any way irreconcilable with the prosecution's evidence. Indeed, Petitioner has never even alleged, much less proven, that his strongly stated belief that the alibi was the only reasonable defense could be shaken. He's never alleged that had he been advised differently by counsel, he would have refrained from testifying. Petitioner was so unequivocally directed towards the presentation of his alibi defense that he poisoned his relationship with his first attorney, Marvin Part, because Mr. Part expressed skepticism about the alibi defense. Further, the manner of Petitioner's testimony at his trial demonstrates that he felt that he was the best person in the world to, as he himself put it, save his life. His testimony was grandiose, he was smirking, he was laughing during his testimony. He represented himself for a while, right? Yes, Your Honor. And that's when the notice of aggravating evidence came in. Yes, Your Honor. And if I understood the footnote correctly in the district court's opinion, or the district court's order, defense counsel somehow didn't become aware of it because the notice was given at the time that Penn Holster was representing himself. That's correct. And then he lied to his defense attorneys about not receiving the note. So getting on to the penalty phase, the district court found that they were not planning to put on a mitigation case. They didn't think they needed to because they thought there was no notice given, mistakenly thought there was no notice given of aggravating evidence, right? That's correct, Your Honor. How does that play into the determination of whether they presented effective assistance at the penalty phase? Well, it answers two of the questions, and the principal question it answers is, what could counsel reasonably have been expected to do under the circumstances with which they were confronted? In this case, counsel was under the misapprehension having been affirmatively misled by Mr. Penn Holster. Counsel, how do we know that Mr. Penn Holster affirmatively misled his counsel? Because Mr. Penn Holster told his attorneys that he never received the notice, and that was a lie, as the trial court determined. Well, the court offered him a continuance. Yes. To prepare a defense. Yes. So what does this have to do with anything? He rejected the offer of a continuance when he became aware that he had to put on a defense. He said he didn't think it mattered whether he could put on a defense, whether he did any work or not. Well, I would say that what he said is he did not believe that additional time would make a significant difference. That's right. And he hadn't done anything. So he said that because he didn't know he had to put on a defense. And then when he was told he could have time to do it, he said it wouldn't make a significant difference if he prepared a defense or investigated or did anything. Well, I would disagree with the court, Your Honor, that he didn't do anything. In fact, he had retained a psychiatric expert who had examined Mr. Penn Holster. But it didn't matter that he was misled because he'd already prepared? No, Your Honor. It matters because the determination about how much time, effort, and energy, given the limited amount of time, effort, and energy any attorney facing a death penalty case has, the decisions about where to best use the limited resources available were guided by the statements made by Mr. Penn Holster. And, indeed, that's precisely what Strickland says the trial counsel must do. I don't understand what you're saying. Kaczynski said what was the effect of Penn Holster's misleading him and not telling him that he should prepare for a death penalty hearing? They were under the apprehension that due to the failure to produce the notice of aggravating evidence, that the prosecution would therefore be prohibited from introducing aggravating evidence. What effect did that have on his duty to prepare a defense? It would instruct counsel that there could potentially be a downside risk to putting on a full-blown case in mitigation because that would then open the door to the opportunity. Despite this abuse of that notion, he found out, the defense counsel finds out that, in fact, he does need to, the state will put on an aggravation case. And then he's given additional time to prepare. So doesn't that sort of cancel out whatever lie Penn Holster told? Because, you know, now at this point he knows. And he has an opportunity to take more time to prepare. Only if he believes that that additional time would produce anything of significance. But up until that point, he didn't know he had to prepare. Well, again, Your Honor, he did do some preparation. Without knowing that he had to. Well, I don't want to put too much time on this, what may be a science for it. I had wondered what effect the misdirection of the notice would have. And it sounds to me like it had no effect at all. We have to deal with the case as if they'd gotten proper notice because at some point he learned that there was notice given. And the defense counsel was given additional time. I would agree with that, Your Honor. Because your time is running, we can just take it from there, right? So we look and see what he said. The question is, is it reasonable? Precisely so, Your Honor. It goes to the question of whether he adequately investigated and prepared. And his answer when he first learned that he had to prepare a defense was, you know, it doesn't matter. I won't take the time. Well, I believe that his answer was that he didn't believe that the additional time would be useful for him. And this is that if I understand you correctly, just to pick up where you were and get away from this. Because the client had already taken the stand, had presented their face to the jury, and that, do you think, affected counsel's determination as to what would be helpful by way of mitigation? Well, I think that there's several things that we can extract from the record. One is Dr. Stahlberg's report to trial counsel that there were no available mental health defenses. But what do we know on this record about what the defense counsel did know about this man's background? Well, we know that he spoke to Petitioner himself, and we know that he spoke to Petitioner's mother. As far as we know, they did nothing else. Is that right? Well, what we do ñ And they had Dr. Stahlberg, and that's it. That's correct, Your Honor. And what happened was Petitioner presented a version of his life story in which he had a relatively benign upbringing that was not marked by any particular trauma or deprivation. We do know that they spoke to Petitioner's mother, and that she essentially said exactly But we have no reason to think that they had any medical records or had any school records or had any psychiatric records that they didn't use or didn't give to Dr. Stahlberg. They just didn't have them. It's correct, Your Honor. There's no reason to believe, but I would point out that there is no indication that Dr. Stahlberg asked for any additional records. And certainly following this Court's decision in Hendricks v. Calderon, once Petitioner has ñ once trial counsel has brought an expert on board for the purpose of doing a psychiatric or psychological evaluation, trial counsel is then allowed to rely on the expertise of that person in terms of what information they will or will not need in order to render a fully developed opinion. And here, Dr. Stahlberg made no indication that his ability to opine ñ undermined by his lack of access to any information. But I always ask for that. Half the time I would have asked for it. Well, but there's no indication that, in fact, he did ask for that material in this case. And if the Court were to look at Dr. Stahlberg's report to trial counsel at the time, there's nothing in that report that says that his ability to opine was somehow mitigated by his lack of access to additional material. How does he know? How does a doctor know if he's not given the material necessary to formulate an opinion? Well, this is precisely what Hendricks v. Calderon has instructed us, Your Honor. It's the doctor's duty to investigate, not the lawyer's. The doctors are the persons in the best position to know what material that they will need in order to render their opinion. If a man has murdered four people in the past, it's the doctor's duty to say,  Well, I would hope to think that the doctor would ask the client when he's doing the examination about his life history. And here we know that Petitioner consistently gave a version of his life history which was relatively benign. Would it have mattered? It looked as though if you learned his actual life history as opposed to how the defendant described his white picket fence childhood, visiting grandparents on the farm, it looks like just standard sociopath. Or that of DSM-IV. Well, and I would agree with that, and I would say even more importantly, Your Honor, under the DSM-III, which of course was the operative text at the time, the point being precisely what Your Honor says. I think that it would be a relatively simple matter for most people to take isolated anecdotes from their lives of unpleasant situations and then elevate those to the status of this was an inaccurate portrait of my entire life. We have to remember that Petitioner has told his attorneys that he had a benign background. Petitioner's mother told his attorneys that he had a benign background. The district court here elected to credit a different version of Petitioner's background than the one that Petitioner and his mother told trial counsel about. But it's probably not fair to fault trial counsel for failing to address this problem. So far, it seems to me that Your Honor, under the first comment about Strickland, that this is under the constitutional standard of sufficient performance. Is that right? I would say that's precisely correct, and I'm glad that Your Honor adverted to Strickland. I think that would be a difficult conclusion to reach in light of Strickland itself, Your Honor. In Strickland itself, the defense attorney talked to the client, talked to the client's mother, talked to the client's wife. The last two conversations, the wife and mother on the telephone, never in person, never contacted a psychiatric or psychological expert, and nevertheless the United States Supreme Court held in a decision which came out coincidentally about one week after the judgment in this case was rendered, came out with a decision saying that that was an adequate investigation under the performance prong of Strickland v. Washington. But I would certainly agree, I think, with the underlying note of the question, which is that this case is more easily resolvable by reference to the second prong of the Strickland argument. And in this case, given the overwhelmingly aggravating nature of Petitioner's testimony at the guilt phase, so before we get to the second prong of Strickland in the penalty phase, I'm puzzled why you have not raised Berger v. Kemp. Doesn't that help the State in some way on the first prong of Strickland in the penalty phase? Oh, absolutely, Your Honor, and I don't mean to give short shrift to any case that would assist me. You're not conceding to Judge Fletcher and others that the first prong is dead? Oh, by no means, and I heard nothing I said is dead. I would hope not, counsel. Oh, absolutely. In light of the concurrence of the panel decision below, I would not. Let's talk about Berger. Didn't many of the facts in Berger somewhat square with the facts in this very case? Both in Berger v. Kemp and in Strickland v. Washington, the facts are very similar. And again, and I think particularly in light of the recent United States Supreme Court case, Landrigan v. Shiro, the court has reaffirmed that when the petitioner tells you things, when the client, the defendant, tells you things, you're allowed to alarm them. In Berger v. Kemp and Landrigan v. Shiro, the client, what was key there, the client told the counsel not to investigate and indicated that he would obstruct any mitigating evidence or any family members coming in. Is there any evidence that that occurred here? Well, there certainly is evidence here that petitioner told his defense attorney that he wanted no mitigating case put on during the penalty phase. Counsel elected not to take that particular bit of advice from the client, however. I don't understand how when the client lies to his lawyer about the actual facts of his upbringing, the lawyer should just stick with that, knowing that there are varying incentives for not telling the whole truth or even remembering the whole truth. I mean, this is a person who was in two automobile accidents, both involving his mother. A very early age. And what absolves the lawyer of doing some independent investigation? Well, and again, here, the lawyer did do additional investigation, and that additional investigation led to nothing that would have alerted him. Actually, it did lead to a great deal of sort of hints, which he didn't follow up. I mean, she said he had epilepsy. He doesn't follow that up, so that blows up because the prosecutor goes on and says, well, there's no medical records of epilepsy. There were actually plenty of medical records of epilepsy, which he didn't have. Similarly, he knew that the child had been put in a facility when he was 11 years old. He wouldn't have taken a whole lot to go get the records of that facility. He didn't do that. In other words, it didn't turn up nothing. It turned up some things before investigation that he didn't investigate. Well, but again, Counsel is in a situation where he has to make strategic choices about what investigation he's going to follow up. And the court is suggesting that rather than put on the version of Petitioner's life story that Petitioner wishes to have presented and that is consistent with the testimony of his mother, Counsel should put on the version that he put on adequately. Because, for example, with regard to the epilepsy, it ended up self-destructive, even though it turns out it was true. Well, I don't know that at the end of the day we've come to the firm conclusion that the epilepsy is genuine. But putting that aside for the moment, there was evidence of epilepsy. How does epilepsy matter? Well, that was precisely the point I was about to make. It's usually more than a matter of psychosis. Exactly. And it really has nothing to do with moral culpability, which is, of course, the question the jury is being asked to address at the penalty phase. But if it was used to undermine another's mitigation testimony, the argument that she had lied about that, it was used that was presented to the jury. Well, I think it would be overstating it to say that she lied about it. I think that they simply pointed out a deficiency on that point. But, again, the epilepsy is really a matter of relative indifference, especially in light of the profoundly aggravating evidence of defendant's lifestyle upon reaching his majority. The hundreds of robberies that he gloried in. To what extent can counsel rely on the fact that his client has taken the stand, presented to the jury, presented himself to the jury, and spoken to the jury, and shown his demeanor? Again, I don't want to fill in your argument too much. Not too much. I mean, to what extent can you rely on that fact in deciding, well, you know, trying to show this guy to be nuts would be futile because the jury is taking a look at him? Well, especially in light of the psychiatric evidence that the trial counsel did obtain from the psychiatric expert who said that there was no mental health defense available. Did the petition testify in Wiggins or Williams? No, in none of those cases. And, indeed, in none of those cases was there any evidence that the defendant in question, the petitioners in those cases, had the kind of profoundly aggravating background that Mr. Pinholster has here. And I think that is a key distinction, in fact, the key distinction, between the instant case and those cases where the United States Supreme Court found relief to be appropriate. In none of those cases was the defendant presented as an unrepentant, violent recidivist criminal. What difference does it make whether evidence that ultimately bears on the penalty phase may have come in in the guilt phase? And I'm not specifically referring to the fact that the mother testified in the guilt phase as well. Much of what the defendant wants to put on or would want to have put on in the penalty phase, as alleged, came in through the mother's testimony in the guilt phase. Does it matter whether it was in the guilt phase or the penalty phase as long as the jury heard it? I believe the young man has spoken. The mother testified at the penalty phase and not the guilt phase, yes. Other people testified at the guilt phase. That's correct, Your Honor. And I take Your Honor's point, which is precisely correct, which is to the extent that there may have been additional cumulative evidence on this point. Also, I think it was probably reasonable, I think it was certainly reasonable, given Mr. Penholster's guilt phase performance for trial counsel to make the election case to his testimony at the penalty phase. Having seen how poorly his testimony served him at the guilt phase, trial counsel would almost certainly have been derelict in not refraining from presenting that evidence later. Does the record contain any evidence about the way in which the two trial lawyers, in this case the defense lawyers, how they were viewed among the local bar? Were they schlocks? Were they really considered good? What were they? Well, unfortunately, the record is relatively devoid of a great deal of information about either of the attorneys who represented Petitioner at trial. They both passed away prior to the federal evidentiary hearing. There was no state evidentiary hearing. One of the attorneys, Mr. Detmer, actually passed away, I believe, even prior to the beginning of the federal proceedings. The other attorney did present a number of declarations in the federal proceeding, but, of course, was unavailable for cross-examination. The record is barren of any characterization of these lawyers and how they were viewed in the local bar. I think that's fair to say, and I would also point out that the record is barren of any evidence regarding the standard of care, and I think that that's an important distinction between this case and, say, the – I'm looking at my notes just because I don't want to – thank you – which is the Maryland case in which – Wiggins relied on the ABA guidelines, which came into play in 89. Well, and even more importantly, in Wiggins, there was testimony from a Supreme Court judge that it was absolutely the standard of care in the jurisdiction at the time to prepare a social history. There is no similar evidence. There never has been any similar evidence presented that the standard of care in California at the time of Petitioner's trial had a similar requirement. Those Eastland things. Perhaps so. They have a – and certainly in 1984, California's death penalty was relatively young, and there was probably not a great deal of evidence to be had on that issue. Is Petitioner's burden to establish the standard that was varied from, according to this case? Certainly, Your Honor. It's his petition not only to prove it, but it would be his burden to allege it. And if I might just spend a brief moment talking about California's determination of this issue, let us keep in mind that all of these questions need to be viewed through the lens of AEDPA and that unless this Court can say that California's determination of these questions was unreasonable, based upon the evidence that was in front of California at the time it was asked to make the decision, then 2254D of Title 28 requires this Court to deny relief. Wiggins and Williams were both AEDPA cases as well. That's correct, Your Honor. And if I understand you correctly, what you're saying is they had their records and we have our records. Well, and certainly in Wiggins in particular, Your Honor, the State Trial Court had determined that trial counsel performed incompetently under Strickland. Really, the question that was being considered by the Court in that case was whether Lockhart v. Fretwell added a gloss on top of Strickland. The Supreme Court ultimately determined that it did not. But the important point there is the State Trial Court had already made the determination that both prongs of Strickland had been satisfied, and it was because the Supreme Court was under misapprehension about the relevant standard that it ultimately determined it should be denied. Under application of the appropriate standard, the determination was clear on that record that relief was to be granted, and indeed, as I say, that was the State Court's original determination. Can I respond to this for a moment? I would like to. Thank you very much, Your Honor. Let me ask you this. Oh, certainly, of course. Your position is that you have defense counsel who is defending his client who is accused of committing rather heinous crimes, and that defense counsel's duties are then limited by his client's wishes and his client's instructions, and defense counsel is not to go beyond that? Well, Strickland v. Washington couldn't be clearer. The choice of what defense to present is the personal choice of the defendant. It is trial counsel. You've got someone who's committed heinous crimes and murders. You know, you've got to know as a defense attorney that there's something wrong with those people. You just can't take their directions and say, well, okay, if that's what you want, that's what I'm going to do. But in this case, Your Honor, the defendant — Is that the duty of a good, competent defense counsel? In this case, Your Honor, defense counsel was confronted with the defendant who insisted upon an alibi, and the testimony in support of that alibi that he was proffering was both plausible and reliable. If he did not present that alibi testimony, I am absolutely confident that we would be now arguing about whether trial counsel was incompetent for failing to present Mr. Penholster's alibi testimony. And given that reality — I don't know whether that would have occurred or not, but it just seems to me that the defense counsel here was — Six and a half hours on the penalty page? Well, putting aside the question of the billing records, Your Honor, I'm not sure the billing records would necessarily reflect all of the conversations that trial counsel had with his client also. The six and a half hours you're adverting to were specifically the six and a half hours. Also, I don't believe those also include any of the time spent with the expert. So I think that that number is misleading. But the other thing that's quite apparent is that the time they did spend preparing the mother was minimal. She said so. In fact, they didn't really prepare her. And they ended up not relying on her at all, not at all. Well, nothing she said, frankly, was particularly useful. This was a case which was very, very difficult to defend. Why would they put her on? Because the alternative — I mean, I think that as a philosophical matter, putting on the defendant's mother to beg for his life is rarely going to be an error, especially when, as here, she is not disavowed. What did she do? How did she help him? Well, again, she offered the — How did she fit into their theories? The theory of the case was an attempt to, as this Court has repeatedly instructed, humanize the defendant by putting on information about his background and upbringing. It turns out she ended up disobeying, to some extent, what his life was. That's the kind of testimony that the defendant gives. I mean, he can hardly characterize that testimony as begging for his life. She does, in fact. I shared it with the district court on this. And her testimony was, in the end, quite harmful. It was, in the end, almost hostile. Well, it was — It's part of begging for his life. Perhaps I was speaking more broadly than just this particular case, Your Honor. And the point is well taken. But, again, the point of the testimony was to present the kind of humanizing background evidence. The fact that that humanizing background evidence was not — Are you talking about this case or just as a general proposition? Well, I'm — Humanizing. You're talking about this case. Now I'm talking about this case. I'm sorry. Before, I was speaking a little more broadly. But in this case, the point was to attempt to humanize the petitioner. I've got less than a minute left. Didn't the state, the prosecution, go into this defendant's background? That they have all this information about him being in a mental institution when he was 11 years old, and his abuse of drugs, and his sister being, I think, a prostitute. His brother was a very bad guy. Oh, did the state have all this, and his father abandoned him when he was — There's no evidence of that, Your Honor, and there's no allegation of such. Huh? There's never been an allegation that the state had — How can you point out if the state had that evidence? I have no idea, Your Honor. You have no idea? I have no idea. There's been no allegation, and there was no evidence presented. Is that really the state's usual approach, to look into the background of a defendant in a murder case? It is certainly not my experience that it is the custom of local prosecutors to look into the backgrounds of family members of the defendant. No, Your Honor, absolutely not. To look in the background of the defendant? For childhood matters, no, Your Honor. That's not — that is not customary. Thank you. They don't look at his juvenile record or anything? Well, to the extent he has a criminal record, absolutely, Your Honor. But there's no evidence that this defendant has such. Thank you, Your Honor. I don't know if there's any Brady material there. There's never been an allegation of such, Your Honor, no. Thank you. Mr. Kennedy? Good morning. May it please the Court. Sean Kennedy on behalf of Mr. Penholster. Do counsel who announce at the guilt verdict that they have done nothing by way of mitigation and then deny an offered continuance to prepare and follow up with 6.5 hours of work over the weekend before the penalty phase render ineffective assistance of counsel in a death penalty case? I think the trilogy of Supreme Court cases specifically focusing on the duty to investigate, prepare, and present mitigation. The cases apply. Let's start with Strickland. Strickland was decided after the verdict in this case. And Strickland is very clear that what the standard is applying is the standard of care at trial. How could Strickland, and by deliberation Williams and Huygens, apply to a case that was tried and the verdict came back before Strickland was decided? Well, Strickland specified standards for evaluating the reasonableness and analyzing whether it's a Sixth Amendment violation, but it didn't create a duty to investigate and prepare for sentencing. You can't make out your case without Strickland and without any of the cases that elucidate Strickland. So what do you rely on? If Strickland is wiped off the books because it doesn't apply to this case, counsel is not pressured. They can't look in the future. They don't see Huygens. They don't see Williams. They don't even see Strickland. It hasn't been decided. So how does counsel get the standard of care? Where do they look? What case do they point to and say, gee, I goofed, or, you know, this is the standard I need to apply? Well, the standard of care- What case? Well, being from this Court is a 1980 trial, and it's talking- But a Ninth Circuit decision had to do with the case either. Well, this Court's authority discussing how to apply reasonable representation- We can't overturn a state decision under Mousladen without a Supreme Court holding. Well, as early as Powell v. Alabama, the high court was talking about the requirement of effective assistance to counsel, at least in a death penalty case. And the ABA guidelines that are referred to- The 89 guidelines? No, I actually- The ones that were in effect for five years after this trial? Well, Your Honor, there is an earlier version from 1980 that were in effect, and Guideline 4-4.1 said that counsel has a duty to thoroughly prepare- Is that in the record in this case? It is, and it's also discussed- Where is it in the record in this case? I looked at this Court's opinion. I didn't see anything there, but maybe- The 1980 guidelines weren't produced as evidence or pointed to? How did they come into the record? I'm sorry, Your Honor. They were discussed by way of the case law, which refers to not only the 89 version, but for older cases, the earlier version in 1980- When you say it was discussed, it's such a passive way of talking about it. Did you have it in your brief before the district court? Yes. Okay. Do you happen to remember where and what those guidelines said? I have the excerpts here, so you- I mean, I realize you might not have it at your fingertips. Your Honor, I'm sorry I don't have it at my fingertips. I'd be happy to provide it later. The district court did not rely on the 1980 guidelines. I think the district court did, two times. It did? Your Honor, two times, Judge Taylor refers to William C. Taylor, which on page 3 and page 7 of his orders, and that case discusses the older guidelines, and I believe Ronpilla also talks about the earlier versions of the guidelines when it discusses Strickland and talks about the duty to thoroughly investigate for not just the guilt phase, but for the sentencing phase. Counsel, what do these 1980 guidelines call for? They call for a thorough-they're not nearly as specific as our new guidelines, but they call for a thorough investigation, not just as the guilt phase, but a thorough investigation for the sentencing. Counsel, I have been puzzled, and I still don't really see what the argument is, except that the time sheet should have shown more time. I have been puzzled about exactly what the lawyer should have been doing and what difference it would have made. I get the idea that, well, he should have talked to more medical people, but he had consulted medical people, and it struck out. The testimony was going to be bad, that basically this person was a sociopath. Well, he should have talked more to the mother. But he talked to the mother, and he put the mother on. Ninth Circuit law seems to be basically it's deficient performance not to put the mother on to humanize the defendant, and maybe it's also deficient performance to put her on when her testimony is not that good. You can't make the stuff up. You have to depend on what your witnesses tell you, and you can't tell them to lie for you. I can't figure out exactly what the lawyer was supposed to do and how it would have made a difference. Why don't you specify really concretely and precisely what the answer to that is? Yes, Your Honor. You can't make it up, but you have to search to find it. And the lawyers here didn't look at records that they could have easily looked at. Which records would have shown what? The medical records would have looked at them. On the epilepsy, the traditional definition is two seizures. I can think of, well, one extremely prominent public official who's had two seizures and hasn't murdered anyone, one of the top officials of our country. Whether he's epileptic or not, I can't see how it even helps. I understand. And if it's just thrown at the jury as he has epilepsy, it doesn't. But the epilepsy was important because it was a key that would have revealed other information about frontal lobe damage. It would have revealed, according to what we have, that he'd been, as the sociopath definition has always said, he'd been basically a sadistic, violent, cruel person since childhood. And what indications there were, he'd already consulted a psychiatrist who said there's no indication of organic brain damage. So, yeah, he might have found out more. He might have piled on some more psychiatrists so they could argue with each other on the witness stand. But he doesn't really have anything. Your Honor, I respectfully disagree because when counsel actually looked at the documents, they found a story that's totally different than that he was a violent and sadistic person since childhood. They found that he was a loving child who had serious head injuries. And after those head injuries, in combination with neglect and abuse. At the age of two and three, before two and three, he was a loving child. And then, I mean, the last head injury he had, he was three years old. It was very young, and some thought it was three, others thought it was a little bit older. Yes, that's true, Your Honor. His mother ran over him and tore off an ear when he was two. And that was the first one, Your Honor. And later his head struck and shattered a windshield. When he was three. When he was three, yeah. Counsel doesn't. And when he was four, let's see. You know, I've read this record, and it seems pretty clear to me that this was a remorseless, violent, consciousnessless guy from the very start. I mean, a sociopath. But I'm, same question as just now. What would you find in here that would say that he's mentally ill? There are lots of people who have epileptic seizures. There are lots of people who are sociopaths. They're not psychotic. They're not mentally ill, as that, in any meaningful amount, right? Well, Judge Taylor. I guess some of your clients in the past may have fit in that category. Just guessing. Well, yeah, and a lot of the witnesses for the government as well. Counsel, as you can tell, my colleagues have suggested a number of issues that are very troubling about what happened here. And I'll just tell you my own concern. I'm really concerned that counsel did not meet the first prong of Strickland in the penalty phase. But the harder question for me is the prejudice phase. Well, let's assume that all of these deficiencies occurred. They didn't investigate long enough. It looks to me like they were surprised by the fact that the state was going to go forward with this anyway. They were going to kind of rely on what happened at the guilt phase. And they chose not to go forward. So let's assume for a moment, arguendo, that it was deficient. Given what was presented at the guilt phase, this guy's boastfulness on the stand, all the other things brought in, why would this have made any difference in this case? I mean, I'm really struggling with that. I don't think the jury, from what I've seen, what do they care whether they talk to another doctor and you have two doctors arguing on the stand about what's happened? They see who this guy is. Isn't that your problem? I understand. As someone who has represented, you know, many people, as Chief Judge Kazunsi talks about, who may be deemed antisocial, I think it's really important not to act like that label is magic. That is one definition, but you have to explain to the jury entrusted with the decision of life and death how and why a person gets to where he is before he shows up in the courtroom. And that's why it's important. I mean, this jury, even with what it saw and with what it didn't see at penalty phase, deliberated at least two and a half days. That suggests it's not the slam dunk that it is for some members of the court, and I think there's a reason for that. Maybe the mother was just great, and even though we've had some comments to the contrary, maybe the jury thought, gee, it's really all her mother's fault, his mother's fault, or at least some of them did, and they agonized for a couple days. And if so, if that meager little kernel that came out kind of almost by happenstance was that convincing to the jury, wouldn't it have been even more powerful if it had been followed up with a comprehensive, incredible explanation? This is for my question. It looks to me as though the more you follow up on this fellow, the worse he looks. You wind up opening the door to all the evidence about his childhood and his antisocial personality disorder, which is not the same as someone who seems to be antisocial. And, my gosh, you persuade a lot of jurors. There's no way to protect other people from pinholes, sir, in or out of prison except by killing them. Well, this may be the reason you don't have to persuade everybody on a jury. There may well be disagreements. You may not be able to persuade Judge Kleinfeld, who may not be sympathetic to his problems, but you may be able to persuade Judge Pragerson. And all you need on a jury is one to find that you're not going to have a death penalty. And the Supreme Court has made it clear that evidence about the defendant's background and character is relevant to the belief that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems may be less culpable than defendants who don't have that. And you cannot speculate as to the outcome of a jury trial unless you have all the factors in there. We just can't say, well, if the jury had known this, that wouldn't have meant anything. My question is, did the lawyers present a disadvantaged background or emotional and mental problems that this defendant experienced? Did the lawyers investigate those backgrounds and problems and present the evidence that was available? What would any minimally competent lawyer have done in the way of investigation that would have had some reasonable likelihood of persuading at least one juror not to work for the death penalty? A reasonably competent lawyer. Minimally competent, I think, is the standard under Strickland. I believe Strickland requires a reasonable investigation at the time and the circumstances. A minimally competent lawyer would have investigated at least what Judge Reinhardt is saying. They would have looked into his background, upbringing, and childhood. They would have looked at the medical documents, the prison documents, the probation documents. They would have discussed with their expert what those documents meant. And more billable hours. Now, what would they be looking for and what would they find? They don't work on billable hours. It's a fair question. They would have found a wealth of mitigation. And I understand that some members of the court don't see it that way, but the district judge, Judge Taylor, who saw and heard what the mitigation presentation could have looked like, he said yes. What would they have looked for? Evidence relevant. Our question has to do only with the record that was before the state court when it made its determination. I think it's relevant because the state court didn't hold a hearing on what could have been presented. It's very clear, and the statute does as well, an evidentiary hearing is not a prerequisite to detect the evidence. So, when the Supreme Court has made it very clear that in making a decision about whether the state determination is contrary to clearly established Supreme Court authority, you consider only the record of dues before that court. Well, the record under D2 is limited to what was presented at state court, but if the California Supreme Court was objectively unreasonable in determining that a prima facie case of strickling had not been made, that determination is unreasonable? You say strickling, but I thought you conceded, or at least you haven't proven to my satisfaction, how strickling applies. So, we keep talking strickling, but strickling didn't exist when this case went to the jury. So, I, you know, you keep giving answers to questions relying on strickling, a strict line of cases, and it's not there for you. I'm sorry, this case was tried in 1984. Many people in the courts today weren't even alive. They might not have been born at that point. Strickling was not on the books until Wiggins was the 89 guidelines. I'm looking at Williams, I don't see any reference to the 89 guidelines. So, the whole structure you've built is built on something that just does not apply to your case. The right to effective assistance of counsel in a capital case certainly existed before strickling. Strickling did, but the contours of what it means and the specifics didn't get nailed down until, and, you know, we look at Supreme Court authority under strickling, and then the question that Joanna was talking about, the psychiatric evidence and all that, that's Wiggins. Wiggins is a case decided in a trial that happened in 1989, after the 89 guidelines, right? Williams was not. And Williams, the crime was committed in 85, and I think the conviction and sentence was 86 or 87. And that was before 89. That's right. And I just want to say one thing, Chief Justice Kavinsky, I don't mean to be dodging your point. Williams is significantly less helpful to you than Wiggins, and still hinges on strickling, which you still haven't tied up to this case. Certainly, under AEDPA, the last reason decision is from the California Supreme Court. So when they were analyzing this issue, strickling certainly does exist at that time. Right, but strickling says this is what you should have known at the time. So when California is applying Supreme Court law, you can say the standard applicable at the time counsel acted, its duty as to what it was supposed to do, didn't include strickling because strickling wasn't on the books. Not unreasonable for the California Supreme Court to take that position, is it? Well. To say counsel is not bound by the decision that's in the future. Well, the California Supreme Court didn't say that. Strickling was deciding what the standards had been and were, not that they knew things that were weak of the Supreme Court decision. They were applying the standards that were the general standards of the law. It's exactly right. Strickling was just. . . Good defense attorneys represented their clients throughout our history. That's exactly right. The right to effective assistance of counsel predates strickling, and the ABA guidelines that are in place, which are the measure we hear over and over for what is reasonable, said counsel must reasonably, must thoroughly investigate the sentencing in addition to the guilt. But what exactly is the case law about whether it's the law that was applicable? Again, at the time the California Supreme Court opinions, strickling did exist. Right? Yes. And certainly in general, new constitutional law that is announced while the case is on direct appeal does apply. Yes. So why do we know that under AEDPA it's the trial, not the appellate decision that matters? No, I think it's the opposite. Under AEDPA, it's the last decision by the state court, which would be the California Supreme Court, that applies. Have you ever argued in this case that strickling is not the applicable standard? No, and we haven't heard that today from the state. The right to effective assistance to counsel certainly — I'm talking about strickling in particular. Has anybody ever suggested that strickling itself is not the governing standard? No. In fact, the state lawyers argue that strickling and Berger are the cases that the court should defer to to find that this representation was reasonable. So strickling, 466 U.S. 689, strickling says you look at counsel's performance using the law in effect at the time of trial. This is what strickling itself says. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. So strickling itself says when evaluating the conduct of counsel, you have to look at the case law, the standards as applicable at the time the counsel acts. It's strickling itself. It's self-limiting. I think what strickling says is you have to look at what is reasonable at the time of the trial. And this represents — I've given you a quote. Why don't you give me a quote back where it says what you think it says? Well, does it say case law? Your Honor, I'm sorry. I thought it was what is reasonable at the time. Does that go to standard of care at the time? Yes. Are you telling us that this case has been — Maybe at the time. I'm sorry, Your Honor. But it's talking about is the standard of a reasonable death penalty lawyer, capital lawyer, that was applicable in that community at that time. That's what it's talking about. It's not referencing case law. That's exactly right. Actually, doesn't Williams really answer the question that strickling gets applied on a case-by-case basis, and that it is final in the sense that strickling existed, but we also look to Williams and Wiggins and Rompilla and the others because they on a case-by-case basis have applied strickling, and that is informative and bears on this case. Yes, and we really must look at that trilogy of cases. The Supreme Court is telling us something about how to analyze prejudice, and it's saying that the court should not devalue social history mitigation because when we look at some of the defendants, particularly in Williams and Rompilla, the idea that their behavior or their records were somehow less than what we're faced with in Mr. Penholster's case, it's just not true. In Rompilla, we have a record of serious violent conduct, and the crime itself is extremely violent, stabbing the bar owner and then burning his body, and he had a prior where he had done that to a female bar owner before, and he had assaults and he had serious violent conduct in the jail, including trying to set the jail on fire, confessing to wanting to assault other inmates, to break other inmates' jaws, and despite all of that reality, the court said that it was objectively unreasonable to determine that there was no prejudice. Wasn't there also in this record, had they had the whole record, some evidence that would counter the antisocial personality disorder at least as a child? My understanding is that the original home that he was in essentially rejected that conclusion when he was 11 or 12 years old. He said he's actually been fine since he's been here, essentially. Yes, there was, Your Honor, and it's important to note that the counsel didn't here conduct an investigation and not put stuff on because they were afraid of a diagnosis of antisocial personality disorder. They did that because they had a factually and legally wrong understanding of California law about penalty phase. Their idea that they could stop the penalty phase because they had not received notice, one, it was factually wrong as we learned, and two, it's legally wrong. The law at that time, there was no law that supported that. They cited a case that doesn't support that. All the cases, the California cases... Dr. Stolberg's incredibly short first report does talk about mitigation, so somebody must have asked him to talk about mitigation. This was in the middle of trial, is that right, March 14, 1984? Yes. So why does he talk about mitigation if he didn't think there was going to be a mitigation issue? It's a good question. I think it demonstrates how thoughtless all of the preparation was in this case. It demonstrates that the six-and-a-half hours is not all the time they spent in mitigation. They actually looked at mitigation while the trial was going on. They talked to psychiatrists about it. So the six-and-a-half hours really isn't the measure of what they did. I think Dr. Stolberg testified that they didn't talk to him, which he thought was surprising. He expected follow-up and didn't receive it. The other thing about this letter is it's apparently clear to me from the letter that this was actually their expert. Was he their expert? He was their expert. This is just a question. What do we know at any time about how easy or difficult it was later on to get a hold of a mother who doesn't keep bomb bombs? The evidence in the district court is very strong in favor of some form of mitigation, and it's devastating if there's another. For example, you said, well, in return, it can also be in that hold. In any way, it can help. It depends on the result of the trial. It's not just a litany of terrible things. What I want to know is do you know anything about how difficult it really is for psychiatrists, at trial, in your case, to try and mitigate a mother who doesn't keep bomb bombs? Well, Your Honor, they didn't try because by their own admission, the only person they talked to was Bernice Beshear, the mother. And all I can say is when we looked for all of the family members, we didn't have any problem finding them. What does that show? Does that mean that every time you have a vicious killer, you have to interview everybody in his family, the mother's brother, the mother's brother's wife, the mother's wife's husband, father's wife? Or anybody other than the mother who was responsible for the miserable childhood? Or can you stick with her? Well, no, I don't. One, in answering Chief Judge Kaczynski's question, as a capital lawyer practicing, yes, I think you ought to interview all family members and update. Counsel, the standard, assuming Strickland does apply, is minimally competent, not aspirationally ideal. On this interview question, Pinholeser said that his grandmother was just wonderful. And in fact, one of the reports was that his greatest period of depression was when his grandparents died. And he loved them, and he denied any abusiveness. He described it as kind of white picket fence trips to the country, visiting his grandparents. Now, once he tells his lawyer not to pursue a mitigation defense, and once he said that grandma and grandpa were just great to him and gave him these wonderful times in the country, why would a minimally competent lawyer pursuing a reasonable investigation dig up some other relative to say mama and grandma are lying, and your client, Pinholeser, is lying, and actually grandma and grandpa beat him to something terrible, and that's why he's a murderer? Why? Why would a minimally competent lawyer do that? Well, when one looks at all the social history records, there are so many red flags of abuse. And to me, the child of the abuser, the number one way the conversation starts is the abused child protects his loved ones, his parents, those who abused him. So that is... A non-abused child also will often say nice things about mom and grandma. This is true, but the other... Then they're all lying, act against their wishes, and dig up some shirt-tail relative somewhere who hates them. Well, that's not what I'm saying, Your Honor. What I'm saying is you conduct... When you do that, you're rendering deficient performance. What are you saying? What are you saying? I'm saying that you conduct a reasonable investigation of the client's life, and then you make those decisions. We know that didn't happen here. We know that most of the reasons, in fact, all of the reasons that was presented at penalty phase were not strategic, were not considered. They were done because counsel had done nothing to prepare, and they felt like they had to put something on. So they put on the easiest person that they could, which was the mother that they had talked to one time. And she wasn't prepared, and she was terrible. What do you mean she wasn't prepared? We also know that child abuse is one of the major problems we have in this country. What do you mean... The world, too. What do you mean that mom wasn't prepared? You can't tell her the why. All you can do is put her on the witness stand to tell the truth. If she asks you, what am I supposed to say? There's only one answer a lawyer can give her, and that's the truth. I can't figure out what preparation was lacking that could have ethically been accomplished that would have made a difference to the mother. Well, that's why mental health professionals are so important, because when a witness, when you're preparing for a penalty phase, when a witness lies to me and I have all the documents, I'm able to say I know... In 1984, when this case was tried, they told counsel, if you looked it up, you've got to do a mental... You've got a psychiatrist who says this guy is not crazy. You've got to go beyond that. What case? Just give me a case. Well, I think Dean and Hendricks say... Hendricks is a 9-second case, right? And Dean as well. Okay, let me be more specific. Let's leave the House of Lords and play Slayer out of it. What U.S. Supreme Court case? You're the lawyer. Strickland hasn't come down. Wiggins is far in the future. The 89 guidelines haven't even been thought of. What case do you look to and say, this is what I need to do according to the United States Supreme Court? I need to pursue this evidence after the psychiatrist comes in and says he's not crazy. I don't think it's a case. I think it's the standard of reasonable... You answer no case? Well, I don't want to say that because I don't want to... Let me just make a yes or no question. Is there a case you would have pointed to and said, you read this case, this is what I'm going to tell you. U.S. Supreme Court case. If the answer is no, that's okay. Well, I don't have one. I can live with that. I don't have one, but that's because I didn't understand... You want to do this on the A.J.? I would love to, because I didn't understand this refinement. Is it your understanding that this case has been litigated entirely through all the courts on the basis that Strickland was the governing standard? Yes. And that only Judge Kuczynski is raising an argument that the state never raised? Well, it's the first time that I've heard it framed in this manner. You know the case as well as I do. Well, that Strickland doesn't apply is only Judge Kuczynski's idea. Well, I have never heard... Has the state ever argued that Strickland doesn't apply? No. Okay. And we're now in an embankment proceeding. So what? Well, that's what we'll have to decide. Give me your argument as to why that matters. You have a waiver? I mean, are we talking waiver here? I mean, are you taking that position? What do you want to do between A.J. and this? Well, I mean, the state has conceded that Strickland applies in my opinion. So I believe that would be a waiver. I think that even in... The issue is competent counsel. Yes. Non-applicability of a particular precedent. That has never been. You have never... We've never held that it is waiver not to cite a particular case, and that's a rule you had better be sure we don't adopt because there are lots of cases in which defense counsel argue X, Y, and Z, and don't cite a case, and we never say waiver. So this is not a rule you want that relies on whether you cite the correct case. The question is effective assistance of counsel or not. So they've always maintained there was effective assistance of counsel. There's no doubt about that, right? The state has always argued that. Yes. Okay. This portion of the argument seems to be now that you're over time, Judge Kuczynski representing the state and you representing the defendant. I wonder how long this is going to continue. Until I say he can sit down. The prerogative of the chair. You want to give us a case? Would you like a 28? Give us a 28-year letter. You remember my question. My question is if you were a lawyer in this case, one that died, one of the two that died, and you said, look, I really want to make sure that I am complying with what the Supreme Court said is effective assistance of counsel before I put on this penalty case, what case would you look to that says you've got to follow up after the psychiatrist says the guy is sane? I'll do that, Your Honor. May I answer just one more question that was raised? I don't know that there's a case like that, but if you know something about your client and you can see that this person has got plenty of problems and you've looked at his past and you've done a decent amount of investigation and you get a report from a psychiatrist like that, maybe you ought to worry about the psychiatrist. And I worry about how these guys got the psychiatrist, because they seem to be rather, I don't know, living in a cloud someplace. Maybe that's not a good analogy. And maybe there's a Brady issue, too. But anyway, if you want to... What? There was a Brady issue, too. There's probably plenty of Brady issues here. May I answer just one question? I'm fighting the ball of those. Please. It was inquired what was the reputation of these lawyers in the community. It was in the record of the law that Mr. Brainard was eventually disbarred, lost his license to practice, and Mr. Sussman, the public defender who had the co-defendant, testified at the evidentiary hearing that he was surprised how lightly both counsel took their obligation to investigate the case. Counsel, we're in the record as a disbarment. That's important. You have to know that. If not, maybe put it in the 28-J letter you're going to send. Thank you for that opportunity. I'll point that out, Your Honor. Let me give you a chance to answer a lot more questions than 28-J letters. James, I believe. So... He used to be my public defender. A man in San Fernando. Pretty good, eh? I trained him well. Okay, Mr. Kennedy. Thank you. Thank you. We'll give you a couple minutes for rebuttal since we chewed up much of your time. I appreciate that very much, Your Honor. What Mr. Kennedy has not pointed out, and I think it goes to the heart of one of the important issues on the first prong of the Strickland issue, is... Do you agree that Strickland applies to this case? I beg your pardon? Do you agree that Strickland applies to this case? I believe that application of Strickland to this case compels denial of relief. Absolutely, Your Honor. And you agree that Strickland does apply? Do I agree that Strickland... Yes, I agree that Strickland applies to this case. If I understood Judge Kaczynski's point, it was that the standard of care was not articulated until Strickland, so perhaps we're a little... That was the earlier version of the ABA guidelines that were in effect in 1982. Isn't that correct? That's absolutely correct, Your Honor. Your Honor, those were vague mistakes. They were in effect a lot before that. You know, 1985, that's just yesterday. You know, I started in 1950. They have guidelines then? Yes, but none that spoke to the death penalty until 1980, and the guidelines in 1980 were extremely, very, very vague. And he was supposed to do a good job. And that's precisely correct, Your Honor, and that's the great problem we have in this case. All we know now is that what Mr. Kennedy has brought to the district court, what he's brought before this court, is what an excellent lawyer with a great deal of resources and over six years to devote single-mindedly to the development of an additional case of mitigation would be able to put together. Is there any question here that the Superior Court judge would not have provided the funds necessary to conduct the investigation that they... Oh, no, Your Honor. My point is that getting back to the point Judge Kleinfeld was making, the question is not what would an excellent lawyer with unlimited times and unlimited funds do. The question is what would a minimally competent counsel do given the restraints, the time... When you're going into this trial that there was going to be a death penalty, there was going to be a penalty phase. Isn't that correct? Well, actually, they were under the misapprehension that the prosecution would not be permitted to put on a penalty phase until... There was a misapprehension that they were not going to put on aggravating evidence. Yeah, no, that's correct, Your Honor. There was no doubt that the prosecution was going to seek the death penalty. No, absolutely. They knew that, and they thought that they were just going to rely upon the evidence presented at the guilt phase. Correct, Your Honor. So why wouldn't the defense counsel in that instance still want to put on a mitigation defense? Well, I think the trial counsel did put on a mitigation defense. Even under Factor K that was in existence at that time. Yes, and they did put on a mitigation defense. Which allows the jury to consider extenuating evidence. Absolutely, and again... We all know now that the Supreme Court has said that extenuating evidence encompasses just about anything possible that the lawyers can come up with. That's exactly right, Your Honor, but again, I would point out to the court that even after all of these years and even with all the time that's been spent single-mindedly toward developing as good a case of mitigation as can possibly be developed, given this person's background, this is what an excellent lawyer would do. That's not the standard, and they have not ever explained what minimally competent, what reasonably competent counsel under Strickland would have done. We really only have two options right now. Do you think at least at a minimal the ADA guidelines that existed in 1980 might provide some guidance to a reasonably competent lawyer? I think that the 1980 guidelines... I'm skeptical of the 1980 guidelines just because they're so vaguely worded, Your Honor. I think that if this court were to look at Strickland... Something like thoroughly investigate, right? Yes, Your Honor, and in fact, in Strickland... Well, they did what the lawyer in Strickland itself did in that very case. When the United States Supreme Court put its imprimatur on that level of preparation, which is virtually identical, and Burger v. Kemp, for that matter, did virtually the same amount of investigation. And in both cases, the United States Supreme Court said unambiguously, that's enough, that is enough for trial counsel to fulfill the minimal constitutional duties. And I'd also just very quickly point out that the federal public defender, in this case, in the district court, they hired Dr. Stalberg, too. So, any question about Dr. Stalberg? Also that he is. That's certainly one... Thank you. Thank you, Your Honor. The case is signed with testimony. Thank you. We are now adjourned.
judges: En Banc Panel: Kozinski, Pregerson, Reinhardt, Rymer, Kleinfeld, Wardlaw, Fletcher W. , Paez, Berzon, Bybee, Smith M.